IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION<br>NO. 23-454-2 |
| v. | |
| RONALD BYRD | |

**MEMORANDUM OPINION**

Defendant Ronald Byrd has been indicted for his alleged involvement in the theft of approximately $230,000 worth of newly minted dimes. Some of the evidence against him was obtained via a search of the backup data associated with his two Apple iCloud accounts. Byrd now moves to suppress this evidence and for a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154 (1978), principally arguing that: (1) the search warrant was overbroad; and, (2) the probable cause affidavit accompanying the warrant application contained material misstatements, omissions, and misrepresentations. For the reasons that follow, his motion will be denied.

I.     FACTUAL BACKGROUND

    A.  The Carjacking Investigation

The government's case against Byrd originates in its investigation of an unrelated carjacking, for which Byrd has been separately indicted. *See United States v. Byrd*, 23-cr-00209 (E.D. Pa. filed May 10, 2023). During that investigation, police obtained a warrant authorizing the search of the data associated with Byrd's two Apple iCloud accounts. Accompanying the warrant application was a probable cause affidavit prepared by FBI Special Agent Joseph Donahue, who attested to the following.

In August 2022, J.H., a FedEx delivery driver, was contacted by P.A., a former coworker, who asked if he could have one of the packages that J.H. was preparing to deliver to Temple

1

Hospital. (P.A. claimed that while the package was addressed generally to Temple Hospital, it was intended for his wife, and he wanted to take delivery directly.) J.H. declined this request, and he continued on to Temple to make the scheduled delivery. Upon his arrival, J.H. began unloading the truck when he was approached by P.A., who repeated his request for the package. J.H. again refused, locked his truck, and contacted his management about the incident. Two FedEx managers, R.J. and D.J., drove out to meet J.H. to discuss the situation. While J.H. was awaiting their arrival, P.A. told him to "name a price" to obtain the package from the truck. After R.J. and D.J. arrived at Temple Hospital, they decided to remove the package from J.H.'s truck and move it to D.J.'s vehicle (a FedEx van). J.H., now escorted by R.J. and D.J., then continued his delivery route, during which they were joined by a black Jeep Cherokee.

As J.H. neared the 3500 block of Grays Ferry Ave. in Philadelphia, the black Jeep cut him off. A Black man wearing a ski mask and orange t-shirt got out and approached J.H. with a gun in his hand. J.H. immediately got out of his truck and ran towards the FedEx facility located around the block. The carjacker then entered the truck and began driving west towards the Grays Ferry bridge. D.J., who witnessed the carjacking, notified police, who were able to use the truck's GPS to locate it in West Philadelphia a few minutes later. J.H., R.J., and D.J. told the responding officers about P.A.'s earlier attempts to obtain a package from the FedEx truck. Police subsequently obtained a search warrant for the package, which contained approximately 9 kilograms of cocaine.

Based on this information, P.A. was arrested and taken to the South Station Division for processing. While there, he provided a post-*Miranda* statement in which he admitted to attempting to obtain a FedEx package at the behest of a man he identified as "Ty," who P.A. stated was the occupant of the black Jeep Cherokee. P.A. provided police with the number to

Ty's cell phone; J.H. had received two calls from that number, which he did not recognize, less than 30 minutes before the carjacking.  T-Mobile records showed that for both calls, the phone was utilizing services on cellular towers in the area of Temple Hospital, indicating that the phone was present in the area at the time P.A. attempted to obtain the package from J.H.  These records further showed that the phone's most used cellular towers served the area encompassing what investigators later determined was Byrd's address of record.

Following his indictment, P.A. told investigators that "Ty" had sometimes gone by the names "Bird" or "Birdman."  According to P.A., he first began dealing with "Birdman" in 2021, when he would purchase packages that P.A. had purloined from his job at FedEx.  On at least one prior occasion, "Birdman" had paid P.A. to intercept a package being shipped via FedEx, which P.A. believed was a test to see if he could perform as promised.

Though he did not know the real identity of "Birdman," P.A. told investigators that he lived in the area of North Park Ave. and West Cambria Street.  Investigators contacted Philadelphia police officers stationed in that area, who indicated that an individual named Ronald Byrd, who had had numerous prior interactions with police, was known to frequent the neighborhood.  Based on this information, investigators showed P.A. a single photograph of Byrd, who identified him as the individual he had known as "Ty" or "Birdman."  They also showed Byrd's probation officer a video taken inside the FedEx truck, and she likewise identified Byrd as the carjacker, specifically noting his "long and narrow head," "deep set eyes," and "distinctive eyebrows."  Based on this evidence, Byrd was arrested and charged with carjacking, 18 U.S.C. § 2119, attempted possession of cocaine, 21 U.S.C. § 841, and several related offenses.

During her interview with police, Byrd's probation officer had provided them with phone

3

numbers Byrd used to contact her, which they determined were linked to two Apple accounts. Because P.A. had indicated that Byrd used Apple's FaceTime application to communicate, investigators believed that the iCloud backup data associated with these accounts might contain further evidence of his wrongdoing, as well as to help them identify Byrd's collaborator in the carjacking (the driver of the black Jeep).

After reviewing the affidavit attesting to the preceding facts, Magistrate Judge Lynne Sitarski agreed that there was probable cause to believe that a search of Byrd's iCloud accounts would uncover evidence of the indicted offenses, as well as evidence regarding his accomplices. She issued the warrant, which authorized the search of both iCloud accounts and the seizure of, *inter alia*: "[t]he contents of all emails associated with the account[s] from June 1, 2022 through April 30, 2023"; "[t]he contents of all instant messages associated with the account[s] from June 1, 2022 through April 30, 2023"; and "[t]he contents of all files and other records stored on iCloud, including all iOS device backups".

Upon reviewing of the iCloud account data, investigators did find evidence relevant to the August 2022 carjacking, including messages between Byrd and P.A. But in addition, the search uncovered evidence of Byrd's involvement in a separate conspiracy that was the subject of another ongoing investigation.

### B. The Cargo Theft Investigation

Around the time of Byrd's arrest and indictment for the carjacking, Philadelphia police officers, with the assistance of federal agents, were investigating a crew responsible for the break-ins of multiple tractor trailers in the Philadelphia area. Some of the goods stolen in these heists included televisions, liquor, and frozen shrimp and crab legs. Most significantly, in April 2023, the crew robbed a tractor trailer containing approximately $230,000 in uncirculated dimes

that were being transported from the U.S. Mint in Philadelphia to the Federal Reserve Bank in Florida. Byrd was on investigators' radar as a suspect, as he had been observed attempting to exchange or deposit thousands of these dimes.

Agent Donahue, who prepared the probable cause affidavit for the search warrant in the carjacking case, was also familiar with the investigation of the dime theft. While reviewing the contents of those accounts—which the government represents were not organized with any folders structure or by date—he and the other investigators saw numerous messages, photographs, and videos indicating that Byrd had participated in the conspiracy to carry out the tractor trailer break-ins. This evidence included:

- A photograph of a large bucket full of dimes, which was sent to Byrd on the night of the dime theft

- Text messages between Byrd and his co-defendants with a link to a "Money Weight Calculator"—described as "a simple tool that calculates how much a certain amount of money would weigh in different dollar bills or coin denominations"

- Pictures of multiple Coinstar receipts from various Maryland supermarkets, each indicating that several hundred dollars of dimes had been deposited

- Numerous messages from Byrd to various contacts offering goods for sale that matched the goods previously stolen by members of the conspiracy

After being presented with this and other evidence, a grand jury indicted Byrd on charges of conspiracy, 18 U.S.C. § 371, receipt and possession of stolen government money, 18 U.S.C. § 641, receipt and possession of goods stolen from interstate shipment, 18 U.S.C. § 659, and aiding and abetting of the same, 18 U.S.C. § 2. This indictment is the case at issue here.

## II.    LEGAL STANDARDS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Byrd's motion implicates two parts of this constitutional guarantee: the particularity requirement, and the oath requirement.

The particularity requirement—*i.e.*, the requirement that a warrant "particularly describ[e] the place to be searched"—bars overbroad warrants.  *United States v. $92,422.57*, 307 F.3d 137, 149 (3d Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "An overly broad warrant 'describe[s] in both specific and inclusive generic terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause." *Id.* (quoting *United States v. Christine*, 687 F.2d 749, 752 (3d Cir. 1982).  The remedy for an overly broad warrant is the suppression of any evidence collected in the portions of the search for which there was no probable cause.  *Id.*

The oath requirement requires that a warrant application be supported by oath or affirmation.  While there is presumption of validity with the respect to such sworn statements, a defendant may request an evidentiary hearing to rebut that presumption.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Before such a hearing is held, however, a defendant must make a "substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56.  If defendant makes this required "substantial preliminary showing" and obtains a *Franks* hearing, he or she again bears the burden of proving the falsity and materiality of the affiant's statements, this time by a preponderance of the evidence.  *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).  If, and only if, this burden is met, "the fruits of the search [are] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999

F.2d 737, 743 (3d Cir. 1993).

### III. DISCUSSION

#### A. Overbreadth Challenge

Byrd first challenges the scope of the warrant authorizing the search and seizure of his iCloud accounts, arguing that this overbreadth "rendered the entire warrant defective (regardless of the manner in which the warrant was actually executed)." He is mistaken; the warrant was not overbroad.[1]

As explained, "[w]hether a warrant is sufficiently particularized depends on the nexus between the evidence to be sought or seized and the alleged offenses." *United States v. Fallon*, 61 F.4th 95, 107 (3d Cir. 2023). This is a fact-intensive inquiry, and where there is probable cause to believe that a search will uncover evidence of a wide-ranging and long-lasting scheme with multiple participants, "an equally broad search for such evidence is permissible." *Id. Fallon*, for example, involved a search targeting the defendants' "headquarters, warehouse, and a safe deposit box held at a local bank, as well as the residences of two employees of the company's information technology department." *Id.* Notwithstanding this broad scope, the Third Circuit held that the warrant authorizing this search was sufficiently particularized, as it specified that agents were searching for evidence of the defendants' involvement in specifically enumerated federal crimes generated during a specific, limited time period. *Id.* at 107-08; *accord United States v. Cobb*, 970 F.3d 319, 328 (4th Cir. 2020) (similarly holding, in the context of the search of a computer, that a warrant was sufficiently particular "because it []

---

[1] Byrd is also incorrect that overbreadth renders a warrant entirely defective. That is only true of general warrants, which "vest the executing officer with unbridled discretion." *$92,422.57*, 307 F.3d at 149 (quoting *Christine*, 687 F.2d at 753). The Third Circuit has consistently contrasted general warrants with "a warrant that is simply overly broad," holding that the latter category can be cured by redacting just those portions that are unsupported by probable cause. *Id.*

confined the executing officers' discretion by allowing them to search the computer and seize evidence of a specific illegal activity").

The warrant authorizing the search of Byrd's iCloud accounts was sufficiently particularized, as it too circumscribed the executing officers' discretion in the manner commanded by the Fourth Amendment. As in *Fallon*, the search it authorized was both limited to a specific time period (June 1, 2022 to April 30, 2023) and tied to specifically enumerated federal crimes (18 U.S.C. §§ 841, 846, 924(c), and 2119). These limitations were sufficient to ensure that the executing officers would not undertake "a general, exploratory rummaging" through the contents of Byrd's accounts. *Fallon*, 61 F.4th at 107. And the facts attested to in the probable cause affidavit supported the finding of probable cause for a search of this scope.

Attempting to show otherwise, Byrd primarily challenges the warrant's temporal limitation, characterizing the ten-month span it identifies as a "seemingly random time period." But as the probable cause affidavit makes clear, this June 2022 through April 2023 span is hardly random. To the contrary, it lines up exactly with the time period between when "Birdman" first asked P.A. to intercept a FedEx package through to their final FaceTime conversation following P.A.'s arrest. In other words, if Byrd's iCloud accounts in fact contained evidence of his involvement in the charged offenses (they did), this ten-month period was precisely the window in which investigators should have focused. "Indeed, it is difficult to conclude how the Government could have more narrowly tailored the warrant." *United States v. Yusef*, 461 F.3d 374, 396 (3d Cir. 2006).

Byrd next briefly argues that the warrant lacked sufficient particularity "as to what the agents would be searching for." Again, he is mistaken. The warrant specified in great detail—across three full pages—the kind of data Apple was directed to disclose, and the kind of evidence

8

investigators would seize. Beyond a conclusory assertion to the contrary, Byrd offers no reason why this itemization was insufficient under either Supreme Court or Third Circuit precedent. He does cite to two cases involving overbroad warrants: *Doe v. Groody*, 361 F.3d 232 (3d Cir. 2004), and *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010). But Byrd gives no explanation as to why their holdings have any bearing here. *See Trade Around World v. Shalala*, 145 F.Supp.2d 653, 659 (W.D. Pa. 2001) ("Passing references to a point, unaccompanied by substantive argument, do not suffice to bring an issue before the court."). And in any event, the facts of those cases are readily distinguishable.[2]

Finally, Byrd attacks the warrant as an "geofence warrant," which he contends are unconstitutional. His arguments on this point are inapposite. "A geofence warrant authorizes the seizure of location data collected from smartphones of individuals within a particular area over a specified range of time." *United States v. Rhine*, 652 F.Supp.3d 38, 66 (D.D.C. 2023). Byrd is correct that such warrants can raise overbreadth concerns, as in at least some cases, they authorize the search of user data absent probable cause. *See, e.g.*, *United States v. Chatrie*, 590 F.Supp.3d 901, 927 (E.D. Va. 2022). But Judge Sitarski did not issue such a geofence here. Rather, she authorized the search of two specific iCloud accounts that there was probable cause to believe would contain evidence relevant to the government's ongoing investigation. Whether or not geofence warrants are constitutional has no bearing on Byrd's motion to suppress the

---

[2] *Doe*, for example, was a lawsuit about the strip search of the wife and 10-year-old daughter of a suspected drug dealer, neither of whom were named in the warrant authorizing the search of their residence. 361 F.3d at 239-40. That scenario is far afield of the facts of this case. *Rosa* is somewhat closer to the mark, as it involved the search of the defendant's electronic devices. 626 F.3d at 58. But the warrant at issue in that case "directed officers to seize and search certain electronic devices, but provided them with no guidance as to the type of evidence sought." *Id.* at 62. "As a result, the warrant violated the Fourth Amendment's proscription against general searches." *Id.* Here, in contrast, the warrant specified in great detail exactly what data that investigators were permitted to seize, and so was neither overbroad nor a general warrant.

fruits of that search.[3]

### B. *Franks* Challenge

In addition to seeking to suppress the fruits of investigators' search of his iCloud accounts, Byrd has also requested a hearing to challenge supposed misstatements and omissions in Special Agent Donahue's probable cause affidavit. But before such a hearing may be held, a defendant must first make a "substantial preliminary showing" of the affiant's untruthfulness, as well as the materiality of those untruthful statements to the magistrate's probable cause determination. *Franks*, 438 U.S. at 155-56. Byrd's motion falls well-short of this preliminary threshold.

At the outset, a "substantial preliminary showing" requires more than a defendant's say-so that the probable cause affidavit contains false statements. "[T]hose allegations must be accompanied by an offer of proof," such as "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Franks*, 438 U.S. at 171; *accord Yusuf*, 461 F.3d at 383 n.8 (a defendant "must present an offer of proof contradicting the affidavit"). Here, Byrd's motion is accompanied by no such offer of proof, and as such necessarily fails. *See United States v. Castro*, 2016 WL 492435, at *8 (E.D. Pa. Feb. 9, 2016). But even setting aside that deficiency, none of the supposed misstatements and omissions he identifies call into question the magistrate's probable cause determination.

First, Byrd challenges the affidavit's chronology of when J.H. received the phone calls from the unknown number, contending that they occurred almost two hours after P.A. contacted J.H. to request the FedEx package, not "directly following [P.A]'s contacts with J.H.," as the

---

[3] The government argues that even if the search warrant was overbroad, the evidence it yielded is nonetheless admissible under the good faith exception. *See United States v. Leon*, 468 U.S. 897 (1984). Because the warrant was not overbroad, the Court declines to consider whether the good faith exception applies here.

affidavit states. But as the government notes, Byrd appears to be misreading the affidavit, which described multiple contacts between P.A. and J.H. throughout the morning, including in-person contacts immediately preceding the phone call. At most, the affidavit was ambiguous about which of these contacts was "directly follow[ed]" by the phone call from the unknown number—a far cry from the kind of "false statements . . . made with reckless disregard for the truth" that are required to obtain a *Franks* hearing. *United States v. Desu*, 23 F.4th 224, 235 (3d Cir. 2022).

Second, Byrd faults the affidavit's use of cell-cite data—*i.e.*, its statements that the phone associated with this unknown number was in the vicinity of Temple Hospital when it called J.H., and that the cell towers most used by this phone served the area encompassing Byrd's address of record. Cell-cite analysis can be inaccurate in dense urban environs, Byrd maintains, and the affidavit omitted this essential caveat. But even if cell-cite data is as inaccurate as Byrd maintains (again, he provides zero evidence to substantiate this factual assertion), and even if investigators were aware of that fact (ditto), a probable cause affidavit need not contain every relevant detail, even those that "could possibly cast doubt on the finding of probable cause. *Teeple v. Carabba*, 2009 WL 5033964, at *28 (E.D. Pa. Dec. 22, 2009) (citing *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). To the contrary, police are "entitled to make the reasonable judgment that the alleged omissions would not be necessary for the magistrate judge to conduct an appropriate inquiry into probable cause." *Id.* Here, where the affidavit merely described this cell-cite data as consistent with a conclusion that the unknown number was controlled by Byrd, and where this was just one fact of many that informed the magistrate judge's probable cause analysis, investigators would have been within their discretion to conclude that an extended discussion of cell-cite data accuracy was unnecessary.

Third, Byrd argues that the affadavit's discussion of P.A.'s statements to investigators

omitted information key to his credibility, such as any benefit he received by cooperating with the government. He also suggests that a different witness, N.C., provided statements to government investigators that conflicted with P.A.'s account. Again, these supposed omissions are entirely speculative; Byrd proffers no evidence that P.A. in fact received any benefits for his cooperation, or that N.C. in fact offered a conflicting statement. And in any event, P.A.'s truthfulness or untruthfulness is irrelevant to the question of whether to conduct a *Franks* hearing. *See United States v. Brown*, 3 F.3d 673, 677 (3d Cir. 1993) ("It is well-established that a substantial showing of the informant's untruthfulness is not sufficient to warrant a *Franks* hearing."). What matters is the affiant's truthfulness or untruthfulness. Byrd provides no reason to conclude that these supposed omissions, even if real, were intentional or reckless on the part of Special Agent Donohue, or that they were in any way material to the ultimate probable cause determination.

### C. Additional Challenges

Finally, Byrd fires a blunderbuss targeting other issues he has with Judge Sitarski's probable cause determination. "When faced with a challenge to a magistrate's probable cause determination, a reviewing court must remember that its role is limited." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). "A magistrate's 'determination of probable cause should be paid great deference.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). And that determination may only be reversed if the magistrate lacked "a substantial basis for concluding that probable cause existed." *Jones*, 994 F.2d at 1055. Here, the four corners of Special Agent Donahue's affidavit provided Judge Sitarski with a substantial basis to conclude that evidence of a crime would be found in a search of Byrd's iCloud accounts, Byrd's objections notwithstanding.

Byrd first argues that because the probable cause affidavit only discussed FaceTime calls, investigators lacked probable cause to search his email accounts. But the search warrant targeted Byrd's iCloud backup data, not just his email accounts. And the affidavit included an extensive discussion of this chosen target. Specifically, the FaceTime calls with P.A. made clear that Byrd possessed and used an iPhone to communicate with his co-conspirators around the time of the charged offenses. Thus, his iCloud data—which was generated automatically by the iPhone and included "instant messages, emails, voicemails, photos, videos, and documents"—could reasonably be expected to contain evidence relating to the charged offenses crimes (as, in fact, it did). This explanation was more than adequate to support Judge Sitarski's probable cause determination.

Byrd also claims that the witness identifications discussed in the affidavit were the result of inappropriately suggestive techniques, as investigators showed P.A. a single photograph of Byrd rather than a complete photo array, and then informed his probation officer that Byrd was under investigation before showing her the video from the FedEx truck. Even if he is correct about that, "unnecessary suggestiveness alone does not require the exclusion of evidence." *United States v. Brownlee*, 454 F.3d 131, 138-39 (3d Cir. 2006). This is particularly in the context of a probable cause determination, where the question is merely whether the identifications displayed "basic signs of reliability." *Pinkney v. Meadville, Pa.*, 95 F.4th 743, 749 (3d Cir. 2024). "That bar is not high," *id.*, and here it was easily met. P.A. was not being asked to identify a stranger, but rather a co-conspirator he had met over two years prior and who he readily recognized but whose legal name he did not know. Similarly, Byrd's probation officer had met with him 15 to 20 times and was able to immediately recognize him. As the affidavit put it, "[a]s soon as she saw the video, she said 'that's him [BYRD].'" These independent

identifications, corroborated by the cell-site data, were sufficiently reliable to persuade a grand jury to indict Byrd for the carjacking. *See United States v. Byrd*, 23-cr-00209 (E.D. Pa. filed May 10, 2023). And they were likewise reliable enough to be considered by magistrate she approved the search warrant application.

## IV. CONCLUSION

Because the search warrant was supported by probable cause, and Byrd has not made a "substantial preliminary showing" that the supporting affidavit contained material falsehoods or omissions, his motion will be denied.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

**WENDY BEETLESTONE, J.**